IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ANTWAN PHELPS,

    Petitioner,

    v.

WARDEN, TRUMBULL
CORRECTIONAL INSTITUTION,

    Respondent.

Case No. 2:16-cv-1065
JUDGE GEORGE C. SMITH
Magistrate Judge King

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the *Petition* (Doc. 1), Respondent's *Return of Writ* (Doc. 6), and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

**Facts and Procedural History**

The Ohio Tenth District Court of appeals summarized the facts and procedural history of the case as follows:

> On January 29, 2013, appellant was indicted on one count of murder, in violation of R.C. 2903.02. The count also carried a firearm specification. Prior to trial, appellant filed a motion *in limine* regarding a dying declaration. The trial court conditionally granted appellant's motion, ruling that the "state has to elicit the necessary evidence before it is admissible as a dying declaration." (Tr. 7–8.)
>
> The matter was tried before a jury beginning December 9, 2013. The first witness for the state was Columbus Police Officer Ryan Fowler. On October 1, 2012, at approximately 7:00 p.m., Officer Fowler responded to a dispatch regarding shots fired; he drove his cruiser to the intersection of Cleveland Avenue and Belcher Drive. The officer arrived at the scene "within approximately a minute" of the dispatch. (Tr. 30.) Upon arriving at the scene, the officer

observed a shooting victim, a black male, between 18 to 20 years of age. The victim was lying on the ground and was conscious.

The officer observed the victim "moaning." (Tr. 32.) The victim told Officer Fowler that his name was Jaquan White. Medical personnel arrived a short time later, and medics informed the officer that the victim's condition was "[l]ife-threatening, critical." (Tr. 34.)

After the victim was transported by medics from the scene, Officer Fowler attempted to secure the scene and find any possible witnesses to the shooting. Officer Fowler talked to several individuals that evening, including John Ray and Michael Sherman who were able to describe the events of the evening.

On October 1, 2012, Ray drove to a convenience store located on the southwest corner of Cleveland Avenue and Belcher Drive. Ray went inside the store and purchased an item. He returned to his vehicle and began to drive home when he received a text message. Ray stopped his vehicle to check his phone, at which time he noticed two black males "standing on the hill facing each other on the hill." (Tr. 49.) One of the men "had anger on his face like he was mad about something." (Tr. 52.) As Ray began to turn left on Belcher Drive he observed "the gentleman that was facing towards the complex turn and take off running." (Tr. 51.) The man ran "anywhere from * * * 5 to 10 feet maybe before I heard the first gunshot in the back." (Tr. 53.) Ray "slammed on [his] brakes to stop from hitting him as he crossed the road." (Tr. 53.)

Ray heard a second shot before the man "got to the street," and then heard a third shot "fired shortly after that one." (Tr. 54.) The man with the weapon was approximately 15 to 20 feet from Ray during this time. Ray had a "good look" at the man with the weapon. (Tr. 55.) Ray made eye contact with the shooter. Ray testified that the man "just stood there. I'm * * * looking at him; he looking at me. And when the young man fell on the other side, he turned and ran." (Tr. 56.) Ray then phoned 911.

Police officers arrived within minutes of Ray's call. Police officers subsequently took Ray to police headquarters where he spoke with a detective. Police officers showed him a photo array of six individuals. Ray picked out photograph No. 6 from the array and testified he was "100 percent sure" of the identification. (Tr. 58.) At trial, Ray identified appellant as the individual he observed firing the shots.

On October 1, 2012, Sherman resided at 2341 Belcher Drive. Early that evening, Sherman walked to a nearby convenience store and "hear[d] a commotion." (Tr. 95.) Sherman looked around and saw "Quan, the guy who got shot." (Tr. 95–96.) Sherman estimated there may have been five to seven other individuals in the area at the time. Sherman entered the store and made a purchase. As he was walking back home, he again heard the commotion. Sherman, who knew appellant from the neighborhood, looked up and "seen Twan up there" in the area of the commotion. (Tr. 99.)

Sherman went inside his house, and approximately 30 seconds later heard three gunshots. Sherman went outside and observed a car leaving the area and saw the victim lying on the ground. Sherman went over and knelt down by the victim, who was conscious. Sherman heard the shooting victim state: "Where they at? What's taking them so long?" in reference to the paramedics. (Tr. 108.)

Sherman later told police officers that he observed a Mazda pulling away from the scene. Sherman told the officers "it looked like Twan's girlfriend's car." (Tr. 105.) Following the shooting, police officers showed Sherman a photo array and he picked out an individual in photograph No. 6, identifying that individual as the person who was arguing with the victim that evening.

Tiffany Lee was in a car with a friend, Kim Tally, on the evening of October 1, 2012. Tally was appellant's girlfriend. Tally was giving Lee a ride home after picking up Lee's daughter from daycare. Tally told Lee about an incident that occurred earlier in the day involving the victim. (Tr. 157.)

Instead of taking Lee and her daughter home, Tally and Lee "go to pick up Antwan." (Tr. 148.) They drove to the back of an apartment complex. Lee testified that "Antwan is out the car and walked to the back of us." (Tr. 150.) Approximately five or ten minutes later, Lee heard gunshots. After hearing the gunshots, "Antwan [got] back in the car and we pull off." (Tr. 150.) As they pulled away, "[a] car hit us." (Tr. 151.) Lee and her daughter got out of the car and Lee called someone else to pick them up and take them home.

The next day, "the victim's people came to my house." (Tr. 153.) Lee testified that "[t]hey jumped on me and smashed out my front windows to my house." (Tr. 153–54.) Lee phoned the police.

3

A detective later interviewed Lee. Lee told the detective that when appellant exited the car he started walking toward the store. Lee also told the detective that appellant made a statement after returning to the vehicle.

Kurt Dietz is a firefighter/paramedic with the Clinton Township Division of Fire. On October 1, 2012, Dietz responded to the scene of a shooting at the intersection of Cleveland Avenue and Belcher Drive. Dietz and the medical personnel placed the victim in the emergency vehicle and transported him to The Ohio State University Hospital. Dietz testified that the victim, who had sustained three gunshot wounds, was in "[p]retty serious" condition at the time. (Tr. 176.)

The victim was having trouble breathing, and he had "cool, clammy skin." (Tr. 177.) Dietz testified that such a condition indicated a "[s]ign of shock." (Tr. 178.) During the transport, the victim said to Dietz: "Please don't let me die." (Tr. 178.) Dietz asked him what had happened, and the victim said that "he had been shot by Twan." (Tr. 179.)

Columbus Police Detective Ronda Siniff responded to the report of a shooting on the date of the incident. After returning from the scene, Detective Siniff prepared a photo array comprised of six photographs, including the photograph of appellant, which appeared as photograph No. 6 on the array. After preparing the array, Detective Siniff gave the array to a "blind administrator," an individual who was not involved in creating the array. (Tr. 203.)

Columbus Police Detective James Porter showed the photo array, identified as State's exhibit No. 2B, to Ray. Ray "selected the individual in position number six" as the individual who "looked like the suspect from the incident." (Tr. 205.)

Columbus Police Detective Robert Connor investigated the shooting. During the investigation, Detective Connor interviewed Sherman. During the interview, Sherman "indicated that he didn't see the actual shooting. But prior to the shooting, he had walked to the corner store and saw the alleged defendant and the victim arguing." (Tr. 212–13.) While returning from the store, Sherman "saw them arguing in the parking lot as well." (Tr. 213.) Sherman identified the victim as "Jaquan." (Tr. 214.) Sherman only knew the potential suspect by his street name.

Detective Connor showed Sherman a photo array, and Sherman "selected the person in position number six on the array." (Tr.

220.) Sherman wrote the following statement at the time: "Person number six was arguing with the victim." (Tr. 221.)

Columbus Police Detective William Miller responded to the crime scene at 10:00 p.m. Detective Miller took photographs of the scene. Police personnel discovered shell casings in the area but did not find a firearm.

Kenneth Gerston, M.D., is a deputy coroner with the Franklin County Coroner's Office. Dr. Gerston was recognized as an expert witness. Dr. Gerston performed an autopsy of the shooting victim, Jaquan White. The victim died approximately six hours after arriving at the hospital for treatment. The autopsy revealed that the victim had been shot three times. The victim suffered entrance wounds to the left arm and back, with the bullet from the arm wound entering the chest area. Dr. Gerston opined that the victim died of gunshot wounds to the chest and back.

Following the presentation of evidence, the jury returned a verdict finding appellant guilty of murder. The jury also returned a verdict finding that appellant did have a firearm on or about his person or under his control while committing the offense. By judgment entry filed December 23, 2013, the trial court sentence appellant to life imprisonment, with the possibility of parole after 15 years, plus three consecutive years incarceration for the firearm specification.

On appeal, appellant sets forth the following four assignments of error for this court's review:

[I.] THE TRIAL COURT ABUSED ITS DISCRETION BY ADMITTING HEARSAY TESTIMONY PREJUDICIAL TO APPELLANT THEREBY DEPRIVING HIM OF HIS RIGHT OF CONFRONTATION GUARANTEED BY THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

[II.] THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY ENTERING JUDGMENTS OF CONVICTION AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 16, OF THE OHIO CONSTITUTION.

> [III.] THE JURY'S AFFIRMATIVE FINDING THAT DEFENDANT–APPELLANT COMMITTED THE OFFENSE OF MURDER IS NOT SUPPORTED BY EVIDENCE SUFFICIENT TO SATISFY THE REQUIREMENTS OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
>
> [IV.] DEFENDANT–APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

*State v. Phelps*, No. 14AP-4, 2015 WL 628481, at *1-4 (Ohio App. 10th Dist. Feb. 12, 2015). On February 12, 2015, the appellate court affirmed the judgment of the trial court. *Id*. On November 10, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Phelps*, 143 Ohio St.3d 1545 (Ohio 2015).

On May 13, 2015, Petitioner filed, with the assistance of counsel, an application to reopen the appeal pursuant to Ohio Appellate Rule 26(B), presenting the following claim:

> Petitioner['] s rights to a fair trial and due process of law were violated by the use of visible shackles during trial.

*Application of Antwan L. Phelps to Reopen* (Doc. 6-1, PageID# 141). On July 30, 2015, the appellate court denied the Rule 26(B) application because the claim relied on matters that did not appear in the trial record. *Memorandum Decision* (Doc. 6-1, PageID# 161-63). Petitioner, acting again with the assistance of counsel, filed an appeal from that decision with the Ohio Supreme Court. *Notice of Appeal of Appellant Antwan L. Phelps* (Doc. 6-1, PageID# 165). However, in the *Memorandum in Support of Jurisdiction of Antwan L. Phelps* (Doc. 6-1, PageID# 170-82), Petitioner presented the following claim:

> Failure of trial counsel to cause the trial court record to reflect that Mr. Phelps was required to wear shackles visible to the jury during trial is sufficient to support a claim under Ohio R. App. P. 26(B)(1) of ineffective assistance of counsel.

*Id.* (PageID# 171). On November 10, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *Entry* (Doc. 6-1, PageID# 191).

On November 8, 2016, Petitioner filed the *Petition,* which raises a single claim:

> GROUND ONE: Ineffective assistance of counsel
>
> Supporting facts: In accordance with the provisions of Ohio R. App. P. 26(B) and the sworn statements of Petitioner's parents, Wayne Phelps and Gwen Milligan, attached hereto as Exhibits 1 and 2, respectively, Petitioner, Antwan Phelps moved to reopen the February 13, 2015, state court appellate decision affirming the judgment of conviction entered in the Franklin County Court of Common Pleas. The application to reopen was submitted by reason of the ineffective assistance of appellate counsel. The application stated Petitioner was denied a fair trial due to his arms and legs being shackled and visible to the jury during trial. Appellate counsel failed to raise this issue on appeal. The appellate court stated that the issue of Petitioner being shackled at trial did not appear on the record. The trial transcript however clearly shows the issue was raised. The U.S. Court of Appeals for the Seventh Circuit in Brian A. Maus v. Dian Baker, et al., No. 13-2420, decided April 2, 2014, where a defendant is shackled in the presence of a jury without adequate justification, the conviction must be reversed and remanded for new trial.

*Petition* (Doc. 1, PageID# 5, 16).[1] Respondent contends that this claim is without merit.

**Standard of Review**

Because Petitioner seeks habeas relief under 28 U.S.C. § 2254, the standards of the Antiterrorism and Effective Death Penalty Act ("the AEDPA") govern this case. The United State Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for

---

[1] Significantly, Petitioner – who has been represented by counsel in all proceedings before the state courts and this Court – did not present to the state court of appeals a claim based on or arising out of any alleged failure by his trial counsel to either object at trial or to make a record before the trial court in connection with the alleged shackling. Although Petitioner attempted to present such a claim for the first time in his appeal to the Ohio Supreme Court, it is well-established that the Ohio Supreme Court will "not consider constitutional claims not raised and preserved in the Ohio Court of Appeals." *Leroy v. Marshall*, 757 F.2d 94, 99 (6th Cir. 1985); *Fornash v. Marshall*, 686 F.2d 1179, 1185 n.7 (6th Cir. 1982)(citing *State v. Phillips*, 27 Ohio St. 2d 294 (1971); *Fitzgerald v. Warden, Chillicothe Corr. Inst.*, No. 1:16-cv-307, 2017 WL 773698, at *7 (S.D. Ohio Jan. 27, 2017), *report and recommendation adopted,* No. 1:16CV307, 2017 WL 773637 (S.D. Ohio Feb. 27, 2017).

prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, — U.S. —, —, 134 S. Ct. 10, 16 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted).

The AEDPA limits a federal court's authority to issue a writ of habeas corpus and forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state court decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Further, under the AEDPA, the factual findings of the state court are presumed to be correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). Accordingly, "a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741,

748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)). The United States Court of Appeals for the Sixth Circuit has summarized these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id*. at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Id*. at 748–49. The burden of satisfying the AEDPA's standards rests with the petitioner. *See Cullen v. Pinholster*, 563 U.S.170, 181 (2011).

### Ineffective Assistance of Appellate Counsel

"In all criminal prosecutions," the Sixth Amendment affords "the accused. . . the right. . . to Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The United States Supreme Court set forth the legal principles governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 556 (1984). A petitioner who claims the ineffective assistance of counsel must demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. *Id.* at 687; *Hale v. Davis*, 512 Fed.Appx. 516, 520 (6th Cir. 2013). A petitioner "show[s] deficient performance by counsel by demonstrating 'that counsel's representation fell below an objective standard of reasonableness.'" *Poole v. MacLaren*, 547 Fed.Appx. 749, 754 (6th Cir. 2013) (quoting *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) and citing *Strickland,* 466 U.S. at 687). To make such

9

a showing, a petitioner must overcome the strong presumption that his counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 689.

Establishing a claim of ineffective assistance of counsel in a habeas case is difficult:

> The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' *id*., at 689 [104 S.Ct. 2052]; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is 'doubly' so, *Knowles,* 556 U.S., at 123, 129 S.Ct., at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123 [129 S.Ct., at 1420]. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland* 's deferential standard."

*Premo v. Moore*, 562 U.S. 115, 122-23 (2011). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington*, 562 U.S. at 101.

*Strickland*'s standards also apply to a claim of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Burger v. Kemp,* 483 U.S. 776 (1987).

> Counsel's failure to raise an issue on appeal amounts to ineffective assistance only if a reasonable probability exists that inclusion of the issue would have changed the result of the appeal. *Id.* The attorney need not advance every argument, regardless of merit, urged by the appellant. *Jones v. Barnes*, 463 U.S. 745, 751–752, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." 463 U.S. 751–52).

*Leonard v. Warden, Ohio State Penitentiary*, No. 1:09-cv-056, 2013 WL 831727, at *28 (S.D. Ohio March 6, 2013*). See also Mapes v. Coyle,* 171 F.3d 408, 427-28 (6th Cir. 1999) (citations omitted).

Petitioner alleges that his appellate counsel should have raised on appeal a claim that he was denied a fair trial due to the visible use of shackles during trial. In support of this claim, Petitioner has submitted the affidavits of his mother and his father, who state that they were present daily during Petitioner's trial and that, at all times, Petitioner's legs and wrists were shackled even though he was never violent or disruptive. *Affidavit of Gwen Milligan* (Doc. 1, PageID# 18-19); *Affidavit of Wayne Phelps* (PageID# 20-21). According to Petitioner's parents, the shackles were visible to the jury and the trial court never conducted a hearing to justify the use of shackles. *Id.*

As noted *supra*, Petitioner filed an application to reopen his state court appeal pursuant to Ohio Appellate Rule 26(B), in which he presented this same claim and submitted these same affidavits. *Application of Antwan L. Phelps to Reopen* (Doc. 6-1, PageID# 141). The state appellate court rejected the claim as follows:

> [A]ppellant contends his appellate counsel was ineffective in failing to argue on appeal that he was denied a fair trial as a result of his arms and legs being shackled during trial. In support, appellant has submitted with his application sworn statements of two family members, appellant's father and mother, who both state they were present at the criminal trial and that appellant's legs and wrists were shackled "[a]t all times during the trial," and that "[t]hese shackles were visible to the jury."
>
> As noted by the state, however, appellant cites to no part of the record indicating that he was required to wear shackles during the trial, and the record on appeal simply does not establish that appellant's legs and wrists were shackled at all times or that any jurors observed him in shackles. As such, the statements submitted by family members require a consideration of purported facts not appearing in the record. Appellate review, however, "is strictly limited to the record." *State v. Smith*, 8th Dist. No. 84687, 2005-Ohio-2711, ¶ 7.
>
> The Supreme Court of Ohio has observed that appellate counsel "cannot properly refer to facts outside the record," as "[a] reviewing court cannot add matter to the record before it, which

> was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." *State v. Hill*, 90 Ohio St.3d 571, 572 (2001), quoting *State v. Ishmail*, 54 Ohio St.2d 402 (1978), paragraph one of the syllabus. Nor can a claim regarding the effectiveness of appellate counsel "be judged by adding new matter to the record and then arguing that counsel should have raised these new issues revealed by * * * newly added material." *State v. Moore,* 93 Ohio St.3d 649, 650 (2001). *See also State v. Hicks*, 8th Dist. No. 83981, 2005-Ohio-1842, ¶ 7 ("[B]y invoking material which is outside of the record, an applicant is requesting that this court exceed the scope of appellate review. Matters outside the record do not provide a basis for reopening.").
>
> Here, because the claim asserted in appellant's application is dependent on alleged facts outside the record, appellate counsel could not have successfully raised this issue on direct appeal. An appellate attorney is "not ineffective for failing to brief an issue that requires evidence outside of the record." *State v. Clark*, 7th Dist. No. 08 MA 15, 2015-Ohio-2584, ¶ 23. Accordingly, appellant has not presented a genuine issue as to whether he has a colorable claim of ineffective assistance of counsel on appeal, and his application to reopen is hereby denied.

*Memorandum Decision* (Doc. 6-1, PageID# 168-69).

The United States Supreme Court held in *Deck v. Missouri*, 544 U.S. 622 (2005), that "the Constitution forbids the use of visible shackles. . . unless that use is 'justified by an essential state interest – such as the interest in courtroom security – specific to the defendant on trial." *Id*. (citing *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986); *Illinois v. Allen*, 397 U.S. 337, 343-44 (1970)). Visibility to the jury is the key inquiry, because a claim based on *Deck* rises or falls on the question of whether the restraints were visible to the jury. *See Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 842 (6th Cir. 2017) (citing *Earhart v. Konteh*, 589 F.3d 337, 349 (6th Cir. 2009); *Mendoz v. Berghuis*, 544 F.3d 650 (6th Cir. 2008)). Where the restraint was not visible, there is no violation of due process. *Id*. Moreover, improper use of visible restraints is subject to harmless error review. *Lakin v. Stine,* 431 F.3d 959, 966 (6th Cir. 2005).

Here, as the state appellate court noted, there is nothing in the trial court record to support Petitioner's claim. Just prior to the start of trial, defense counsel asked the trial judge to remove handcuffs. *Transcript* (Doc. 7-1, PageID# 203)("Judge, can we have the handcuffs taken off?"). The *Transcript* does not indicate a verbal response by the trial judge, but does seem to indicate a break of some sort at that point; prospective jurors entered the courtroom thereafter. *Id*.

The claim presented by Petitioner to both the state court of appeals and to this Court is based – not on any portion of the trial record – but on the affidavits of Petitioner's parents. In Ohio, any claim supported by evidence that is not readily apparent from the face of the record must be raised in a petition for post conviction relief under O.R.C. § 2953.21. *State v. Hill,* 90 Ohio St.3d at 283 (citing *State v. Ishmail*, 54 Ohio St.2d 402 (1978)); *Cowans v. Bagley*, 236 F.Supp.2d 841 (S.D. Ohio 2002) (In Ohio, claims that do not appear on the face of the record must be raised in a post conviction action pursuant to R.C. 2953.21) (citing *State v. Cole*, 2 Ohio St.3d 112 (1982)).[2] As the state court of appeals held, Petitioner's appellate counsel was not ineffective for failing to raise this claim in Petitioner's direct appeal. Therefore, Petitioner has failed to establish the denial of the effective assistance of appellate counsel under the two-prong *Strickland* test based on his attorney's failure to raise this claim on direct appeal. It follows that Petitioner has failed to establish that the state appellate court contravened or unreasonably applied federal law, or based its decision on an unreasonable determination of the facts in light of the evidence presented, so as to warrant federal habeas relief.

**Recommended Disposition**

Therefore, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

---

[2] The Court expresses no opinion as to whether post conviction relief under O.R.C. § 2953.21 remains available to Petitioner.

**Procedure on Objections**

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(B)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

      *s/ Norah McCann King*
      Norah McCann King
      United States Magistrate Judge

October 12, 2017